IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NAVY FEDERAL CREDIT UNION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:18-cv-1424 (AJT/TCB) |
| ) | |
| LTD FINANCIAL SERVICES, LP, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Navy Federal Credit Union ("Navy Federal") alleges that it sold certain accounts to Defendant Advantage Assets II, Inc. ("AAII") pursuant to a written contract, and that AAII subsequently resold those accounts to Defendant Debt Management Partners, LLC ("DMP") in violation of that contract, after which DMP allowed holders of those accounts to be subjected to unscrupulous debt-collection activities. DMP has filed a Motion to Dismiss [Doc. 55] ("the Motion") on the basis that the Court lacks subject matter jurisdiction.[1] For the foregoing reasons, the Motion is GRANTED and the action is DISMISSED.

## I. BACKGROUND

Navy Federal alleges the following, which the Court assumes to be true for the purpose of the Motion:

---

[1] DMP and the other Defendants have also filed motions to dismiss for failure to state a claim. *See* Defendant LTD Financial Services, L.P.'s Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint Counts One Through Five [Doc. 48], Defendant LTD Financial Services, L.P.'s Re-Filed Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint Counts One Through Five [Doc. 63], Defendant Advantage Assets II, Inc.'s and LTD Financial Services, L.P.'s Rule 12(b)(6) Motion to Dismiss or Strike Plaintiff's Claims for Trebled or Punitive Damages Under Breach of Contract Claims [Doc. 66], Defendant Bayview Solutions, LLC's Rule 12(b)(6) Motion to Dismiss Count Six of the Amended Complaint [Doc. 71], and Defendant Bayview Solutions, LLC's Rule 12(b)(6) Motion to Dismiss or Strike Plaintiff's Claim for Trebled or Punitive Damages Under Count Six of the Amended Complaint [Doc. 72].

Navy Federal is a federally chartered, not-for-profit credit union based in Vienna, Virginia. [Doc. 52 at 1, 6]. Historically, Navy Federal has not sold its members' accounts to any third parties. *Id.* at 2. However, on April 30, 2012, it sold certain of its accounts to AAII pursuant to a Consumer Loan Purchase and Sale Agreement ("the CLPSA"). *Id.* The CLPSA, which was structured to protect Navy Federal's members from harassment and to protect Navy Federal's reputation, prohibited AAII from transferring accounts to any other third party without Navy Federal's consent. *Id.*

Nevertheless, on September 20, 2018, AAII sold the accounts to DMP through AAII's agent, LTD Financial Services, LP ("LTD"), without notifying Navy Federal of the transfer. *Id.* DMP subsequently sold some of those accounts to other parties, including to Defendant Bayview Solutions LLC ("Bayview"). *Id.* at 2–3. Thereafter, Navy Federal learned that some of the holders of the transferred accounts had been subjected to "improper, unfair, deceptive, misleading, aggressive, intimidating, and/or harassing tactics and practices from debt collectors who purported to be acting with respect to the Accounts." *Id.* at 2. Navy Federal promptly demanded that AAII, LTD, and DMP do something to stop these tactics. *Id.* at 3. Upon receiving this demand, LTD's Chief Executive Officer and President admitted that AAII and LTD failed to notify Navy Federal of the transfer and obtain its consent, which was required by the CLPSA. *Id.* However, these Defendants refused to take any action until after Navy Federal filed this suit. *Id.* After this suit was filed, AAII and LTD reacquired some of the transferred accounts but still allowed Bayview to retain 322 of the accounts. *Id.* The holders of those 322 accounts continue to be subjected to the alleged improper debt-collection practices. *Id.*

Plaintiff filed this action on November 16, 2018, and then filed a six count Amended Complaint on December 17, 2018. [Docs. 1, 52]. Counts One through Five allege various

breaches of the CLPSA by AAII and LTD. *Id.* at 12–17. Count Six alleges that Bayview intentionally made defamatory statements concerning Navy Federal to the account holders by "expressly stat[ing] or impl[ying] that Bayview and its debt collectors, agents, or contractors, were acting as Navy Federal's agents or that Navy Federal sponsored, approved of, or was connected to the unlawful conduct." *Id.* at 18. All six counts seek relief pursuant to Virginia law. *Id.*

Navy asserts jurisdiction solely under 28 U.S.C. § 1332(c) based on diversity of citizenship. In that regard, Navy Federal alleges that diversity jurisdiction exists because the amount in controversy exceeds $75,000 and the parties are citizens of different states. *Id.* at 3–4. Specifically, Navy Federal alleges that Defendants maintain their principal places of business in Texas, New York, and Florida, while Navy Federal maintains its principal place of business in Virginia. *Id.* at 3.[2]

## II. LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) places the burden on the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *White v. CMA Const. Co., Inc.*, 947 F.Supp. 231, 233 (E.D. Va. 1996) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). A Rule 12(b)(1) motion may challenge subject matter jurisdiction in two different ways. First, a Rule

---

[2] DMP filed the instant Motion on December 18, 2018. [Doc. 55]. DMP argues that the Court lacks personal jurisdiction over DMP and subject matter jurisdiction over the claim. *Id.* The Court held a hearing on the Motion and the other Defendants' motions to dismiss on February 1, 2019, at which the Court took the Motion under advisement and ordered the parties to provide additional briefing as to (1) whether 28 U.S.C. § 1332(c), which clearly applies to corporations chartered under state law, also applies to corporations, like Navy Federal, chartered under federal law; (2) if § 1332(c) does not apply, whether the "localization" test articulated in cases such as *Feuchtwanger v. Lake Hiawatha Federal Credit Union*, 272 F.2d 453 (3d Cir. 1959) applies and provides a possible basis for federal diversity jurisdiction over such federal credit unions; and (3) if the "localization" test does apply, whether Navy Federal is sufficiently localized in Virginia under the analysis set forth in those cases. [Doc. 135].

12(b)(1) motion may attack the complaint on its face, asserting simply that the complaint "fails to allege facts upon which subject matter jurisdiction can be based." *Id.* (quoting *Adams*, 697 F.2d at 1219). Under such a facial challenge to jurisdiction, "the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id.*

A defendant may also challenge "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). In such a fact-based challenge, the district court's "very power to hear the case" is at issue; and the district court is then free to weigh the evidence to determine the existence of jurisdiction. *See Adams*, 697 F.2d at 1219. "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen*, 549 F.2d at 891. When such a factual challenge is made to jurisdiction, the jurisdictional facts must be determined with the same procedural safeguards as afforded through a motion for summary judgment. *See Kerns v. United States*, 585 F.3d 187 at 192–93 (4th Cir. 2009).

## III. ANALYSIS

As a threshold matter, DMP contends that here is a lack of complete diversity on the ground that Navy Federal is a "cooperative association," rather than a corporation, and therefore that it is a citizen of every state in which one of its millions of members is a citizen, some whom are citizens of the same states as the defendants. [Doc. 150 at 2]. However, according to the plain language of the statute under which they are created, federal credit unions are corporations. *See* 12 U.S.C. § 1754 (stating that upon approval by the board of a federally chartered credit union, the credit union's certificate "shall be the charter of the corporation" and that upon such

4

approval "the Federal credit union shall be a body corporate and as such . . . shall be vested with all of the powers and charged with all of the liabilities conferred and imposed by this chapter upon corporations organized hereunder"). Diversity jurisdiction is therefore not defeated on that basis.

Having established that Navy Federal is a corporation, the Court must next decide two interdependent questions, neither of which has been previously considered by the Supreme Court or the Fourth Circuit: (1) whether 28 U.S.C. § 1332(c), which sets forth the criteria for assessing the state citizenship of state-chartered corporations, also applies to *federally* chartered corporations; and (2), if not, how is the state citizenship, if any, of federally chartered corporations determined? With respect to these issues, the Court concludes (1) that § 1332(c) does not apply to federally chartered corporations and Navy Federal, as a federally chartered corporation, cannot establish that it is a citizen of any state under the terms of § 1332(c); and (2) diversity jurisdiction may not be established outside the terms of Section 1332(c), through the "localization test" or otherwise.

### A. 28 U.S.C. § 1332(c) Does Not Apply to Federal Credit Unions

Navy Federal first argues that it is a citizen of Virginia pursuant to 28 U.S.C. § 1332(c) because Virginia is its principal place of business. [Doc. 151 at 20]. Neither Congress, the Supreme Court, nor the Fourth Circuit have addressed whether § 1332(c) applies to federally chartered corporations. Further, the courts that have considered the question are split as to § 1332(c)'s applicability.[3] The majority, however, have concluded that Congress intended

---

[3] As to courts that have concluded that § 1332(c) does not apply to federally chartered corporations, *see, e.g., Loyola Fed. Sav. Bank v. Fickling*, 58 F.3d 603 (11th Cir. 1995); *Hancock Fin. Corp. v. Fed. Sav. & Loan Ins. Corp.*, 492 F.2d 1325 (9th Cir. 1974); *Arlington Cmty. Fed. Credit Union v. Berkley Reg'l Ins. Co.*, 57 F. Supp. 3d 589 (E.D. Va. 2014); *Northern Virginia Foot & Ankle Assocs. v. Pentagon Fed. Credit Union*, 2011 WL 280983 (D. Md. Jan. 26, 2011); *Lehman Bros. Bank, FSB v. Frank T. Yoder Mortg.*, 415 F. Supp. 2d 636 (E.D. Va. 2006); *Iceland Seafood Corp. v. Nat'l Consumer Co-op. Bank*, 285 F. Supp. 2d 719 (E.D. Va. 2003). Nevertheless, several district courts have held that Navy Federal is a citizen of Virginia because Virginia is its principal place of business, thus

§ 1332(c) to modify only the citizenship status of state-chartered corporations.[4] This Court agrees.

First, the text and structure of Section 1332(c) suggest that the provision applies only to state-chartered corporations. In relevant part, the text states, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). "Corporation" is a broad term that, taken in isolation, would certainly apply to federally chartered corporations. However, a general term in a statute "does not stand alone, but gathers meaning from the words around it." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961). Here, the words of § 1332(c) indicate that Congress intended "corporation" to have a more "precise and narrow application." *Id.* The provision states that a corporation is a citizen of the state in which it was incorporated *and* in which it has its principal place of business. The use of the word "and" between the clauses naming the state of incorporation and the state or foreign state serving as the principal place of business suggests that the provision contemplates only those corporations that have both, i.e., those chartered under state law. Based on this textual

---

assuming, without discussing, that § 1332(c) applies. *See, e.g., Dean v. Navy Fed. Credit Union,* 2009 WL 3817587, at *3 (D. Md. Nov. 12, 2009); *Lloyd v. Navy Fed. Credit Union,* 2018 WL 1757609, at *4 (S.D. Cal. Apr. 12, 2018); *Welsh v. Navy Fed. Credit Union,* 2017 WL 5075930, at *1 (W.D. Tex. June 9, 2017); *Heuvel v. Navy Fed. Credit Union,* 2016 WL 7155769, at *4 (S.D.W. Va. Dec. 7, 2016); *Borlo v. Navy Fed. Credit Union,* 458 B.R. 228, 229 (D. Md. 2011); *Dakari v. Dawson,* 2006 WL 88659, at *2 (N.D.N.Y. Jan. 11, 2006).

[4] *See, e.g., Parks Heritage Fed. Credit Union v. Fiserv Sols., Inc.,* 2017 WL 74280, at *4 (S.D.N.Y. Jan. 4, 2017) ("The general rule with respect to federal credit unions is that they are not considered to be a citizen of any particular state for the purpose of establishing diversity of citizenship. Rather, they are considered stateless 'national citizens' that are not amenable to § 1332(a) jurisdiction." (citizens and internal quotation marks omitted)); *Iceland Seafood Corp. v. Nat'l Consumer Co-op. Bank,* 285 F. Supp. 2d 719, 723 (E.D. Va. 2003) ("The citizenship of a federally chartered corporation is determined by the express language of the chartering statutes and the geographic scope of activities authorized in those statutes. If the chartering statutes expressly provide for citizenship in a particular state, or incorporate the entity as a 'body corporate' of a particular state, then a federally chartered corporation, even with wide spread actual and authorized activities, may have state citizenship for diversity purposes." (citations omitted)); *Burton v. U.S. Olympic Comm.,* 574 F. Supp. 517, 520 (C.D. Cal. 1983) ("[T]his court declines to hold that Congress intended to permit § 1332(c) to serve as a basis for granting state citizenship to federal corporations. The matter should be left for future Congressional clarification, if any is required.").

analysis, the Supreme Court has observed that national banks, which, like federal credit unions, do not have a state of incorporation, do not "fit comfortably within" § 1332(c)'s embrace:

> A business organized as a corporation, for diversity jurisdiction purposes, is "deemed to be a citizen of any State by which it has been incorporated" and, since 1958, also "of the State where it has its principal place of business." § 1332(c)(1). State banks, usually chartered as corporate bodies by a particular State, ordinarily fit comfortably within this prescription. Federally chartered national banks do not, for they are not incorporated by "any State." For diversity jurisdiction purposes, therefore, Congress has discretely provided that national banks "shall . . . be deemed citizens of the States in which they are respectively located." § 1348.

*Wachovia Bank v. Schmidt*, 546 U.S. 303, 306 (2006). Moreover, in addition to state-chartered corporations, the provision specifically mentions corporations chartered in a "foreign state" while omitting any reference to federal corporations. Thus, it mentions every type of corporation *except* federal corporations. Section 1332(c)'s plain text therefore counsels against its application to federal credit unions, which do not have a state of incorporation and are not referenced in the text.

Section 1332(c)'s legislative history further supports the conclusion that § 1332(c) does not apply to federal credit unions. Prior to 1958, federal law was silent as to how to determine the citizenship of corporations for purposes of assessing federal diversity jurisdiction; and over the years, in the absence of congressional direction, the Supreme Court's approach to corporate citizenship had shifted. The Court first held in 1809 that corporations were not "persons" capable of maintaining citizenship, and therefore that diversity jurisdiction was to be assessed by considering the citizenship of every member of the corporation. *See Bank of U.S. v. Deveaux*, 9 U.S. 61, 91–92 (1809) (Marshall, C.J.). Thus, unless the personal citizenship of every member of a corporate litigant was different from the citizenship of the opposing party, federal diversity jurisdiction could not lie. Then, in 1844, the Court attempted to avoid the harsh consequences of this doctrine by creating the legal fiction that state-chartered corporations were "persons" that

could be deemed citizens of the state in which they were incorporated and nowhere else. *See Louisville, C. & C.R. Co. v. Letson*, 43 U.S. 497, 535 (1844) ("The residence of a corporation is not determined by the residence of its members, nor by that of the president and directors. A corporation created by a law of South Carolina, and for an object to be pursued in South Carolina, must have its location there, and nowhere else."). In 1853, the Court again revised its its analysis in an attempt to reconcile its prior decisions by declaring the conclusive, yet often fictitious, presumption that all of the corporation's members were also citizens of the state of incorporation. *See Marshall v. Baltimore & O. R. Co.*, 57 U.S. 314, 329 (1853) ("The presumption arising from the habitat of a corporation in the place of its creation being conclusive as to the residence or citizenship of those who use the corporate named and exercise the faculties conferred by it, the allegation that the 'defendants are a body corporate by the act of the General Assembly of Maryland,' is a sufficient averment that the real defendants are citizens of that State."). Thus, while purporting to adhere to the previous rule that a corporation's citizenship is to be determined by the citizenship of its members, the Court created a doctrine that had the practical effect of ensuring that a corporation's state of incorporation was its sole state of citizenship for diversity purposes. The rule in *Marshall* stood for the next century, until Congress passed the 1958 Amendment, which created § 1332(c) as it stands today.

The available legislative history also reveals that Congress's passage of the 1958 Amendment was intended to reduce the number of cases in the federal courts. *See, e.g.*, S. Rep. No. 1830, at 3 (1958) ("In adopting this legislation, the committee feels that it will bring the minimum amount in controversy up to a reasonable level by contemporary standards and that it will ease the workload of our Federal courts by reducing the number of cases involving corporations which come into the Federal district courts on the fictional premise that a diversity

8

of citizenship exists."); H.R. Rep. No. 1706, at 2-3 (1958). The Amendment raised the amount-in-controversy requirement from $3,000 to $10,000 and curbed the types of cases that could be removed from state court. *See* James W. Moore & Donald T. Weckstein, *Corporations and Diversity of Citizenship Jurisdiction: A Supreme Court Fiction Revisited*, 77 Harv. L. Rev. 1426, 1431 (1964). This same purpose also motivated the passage of § 1332(c) specifically. In that regard, both the House and Senate reports preceding the Amendment's adoption make clear that § 1332(c)'s goal was to reduce the number of diversity cases involving corporations. *See* S. Rep. No. 1830 at 6 ("Figures assembled as the result of a recent survey, while showing considerable variation, indicate that from 3.6 to 23.5 percent of such [diversity cases involving corporations] will be eliminated."); H.R. Rep. No. 1706, at 5 (citing the same estimates).

In enacting the "principal place of business" provision in § 1332(c), Congress specifically sought to eliminate federal jurisdiction over corporations that operated in a single locality yet incorporated in a different state to manufacture federal jurisdiction. The legislative history specifically mentions that Congress had the Supreme Court's precedent in *Marshall* and subsequent cases in mind and indeed sought to abrogate them. It did so to prevent corporations that were essentially local in nature from manufacturing federal jurisdiction by incorporating in a different state:

> This fiction of stamping a corporation a citizen of the State of its incorporation has given rise to the evil whereby a local institution, engaged in a local business and in many cases locally owned, is enabled to bring its litigation into the Federal courts simply because it has obtained a corporate charter from another State.... It appears neither fair nor proper for such a corporation to avoid trial in the State where it has its principal place of business by resorting to a legal device not available to the individual citizen.

S. Rep. No. 1830 at 4. Thus, the provision was designed to "eliminate those corporations doing a local business with a foreign charter" from federal diversity jurisdiction, but not foreign-

chartered corporations "which do business over a large number of states." *Id.* at 5. In doing so, § 1332(c) sought to create a simple rule that would also "prevent frauds and abuses of the Federal jurisdiction by corporations primarily local in character." *Id.* at 10 (statement of Rep. Celler). *See also, e.g., id.* at 4, 5, 10, 20; H.R. Rep. No. 1706, at 9 (statement of Joseph F. Spaniol) ("One of the principal aims of these proposals is to alleviate the crowded conditions in the district courts which have been prevalent for the last decade by eliminating the filing of cases which concern controversies purely local in nature, though one of the parties may be a corporation chartered in another State . . . .").

When Section 1332(c) was enacted in 1958, the state of the law as to federally chartered corporations had diverged completely from that of state-chartered corporations. Early in their history, the federal courts had jurisdiction over many federally chartered corporations because their federal charters alone created federal question jurisdiction. *See Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823 (1824) (holding that federal question jurisdiction existed whenever federal law "forms an ingredient of the original cause," and therefore that federal question jurisdiction existed when a federally chartered bank (a form of corporation) was involved because in every such case, interpretation and application of the applicable federal chartering statute was such an ingredient). As the number of federal corporations and the consequent number of cases in federal court increased, Congress began to take steps to reduce the federal court caseload in that regard. From 1882 to 1925, Congress passed laws that eliminated automatic federal question jurisdiction in cases involving national banks, federally chartered railroad companies, and ultimately, all other federal corporations. Paul E. Lund, *Federally Chartered Corporations and Federal Jurisdiction*, 36 Fla. St. U. L. Rev. 317, 332

(2009). The only exception made was for federal corporations in which the government retained more than fifty percent of the capital stock. 28 U.S.C. § 1349 (1948).

After Congress sharply reduced the availability of federal question jurisdiction over federally chartered corporations, some such corporations attempted to invoke diversity jurisdiction instead. In 1916, however, the Supreme Court held in *Bankers' Trust Co. v. Texas & Pacific Railway Co.*, a case involving a federally chartered railroad corporation, that the corporation in that case was "not a citizen of any state." 241 U.S. 295, 309. The Court explained that the corporation "was incorporated under acts of Congress, not under state laws; and its activities and operations were not to be confined to a single state, but to be carried on, as in fact they are, in different states." *Id.*

Against this legal background, Congress passed the 1958 Amendment, which included § 1332(c). Further, after the passage of the 1958 Amendment, courts have continued to apply the *Bankers' Trust* rule. *See, e.g., Petrousky v. Civil Air Patrol, Inc.*, 1998 WL 213726, at *2 (N.D.N.Y. Apr. 10, 1998) (holding that the Civil Air Patrol, a federally chartered corporation, has no state citizenship); *Little League Baseball, Inc. v. Welsh Publ'g Group, Inc.*, 874 F. Supp. 648, 655 (M.D. Pa. 1995) (holding the same as to Little League Baseball); *Burton v. U.S. Olympic Comm.*, 574 F. Supp. 517, 522 (C.D. Cal. 1983) (holding the same as to the United States Olympic Committee); *Crum v. Veterans of Foreign Wars*, 502 F. Supp. 1377, 1381 (D. Del. 1980) (holding the same as to the Veterans of Foreign Wars); *Monsanto Co. v. Tenn. Valley Auth.*, 448 F. Supp. 648, 651 (N.D. Ala. 1978) (holding the same as to the TVA); *Rice v. Disabled Am. Veterans*, 295 F. Supp. 131, 134 (D.D.C. 1968) (holding the same as to the Disabled American Veterans); *Harris v. Am. Legion*, 162 F. Supp. 700, 710 (S.D. Ind. 1958) (holding the same as to the American Legion), *aff'd*, 261 F.2d 594 (7th Cir. 1958).

Surely, Congress was aware of the law concerning federally chartered corporations at the time that it passed § 1332(c). However, aside from a non-substantive mention in an appendix, § 1332(c)'s legislative history does not contain a single reference to federally chartered corporations or the law governing them. *See* [Doc. 151 at 19]. It thus appears that Congress never considered the possibility that § 1332(c) would or should be read to alter federal court jurisdiction over federal corporations. Moreover, reading § 1332(c) to create a new basis of jurisdiction over federally chartered corporations (jurisdiction on the basis of a federal corporation's principal place of business) would directly contravene Congress's primary purpose to reduce the caseload in the federal courts, which motivated the passage of both § 1332(c) and the measures reducing federal jurisdiction over federally chartered corporations. Given the discussions that are reflected in the legislative history, one would expect some indication that Congress wished to significantly reverse the progress it had made in reducing the number of diversity cases involving state corporations on the federal docket by simultaneously *expanding* federal jurisdiction over federal corporations.

Finally, Congress's subsequent passage of legislation providing for state citizenship of specific types of federally chartered corporations confirms that Congress never intended § 1332(c) to apply to federal corporations. In 1971, Congress passed a statute providing that farm credit banks, federal land bank associations, production credit associations, and other entities in the Federal Farm Credit System are to be considered citizens of the states in which their "principal office is located." Pub. L. No. 92-181, § 5.24, 85 Stat. 583, 624 (1971) (codified at 12 U.S.C. § 2258). Importantly, the legislative history reveals that Congress passed this statute to "give PCAs the same access to the Federal district courts as is enjoyed by private citizens, corporations and other legal entities." H.R. Rep. No. 94–609, at 3 (1974), *reprinted in*

12

1975 U.S.C.C.A.N. 2148, 2150. If § 1332(c) applied to federally chartered corporations, this subsequently enacted statute would have been superfluous.

More recently, Congress has also passed statutes establishing that the Rural Telephone Bank, Amtrak, and the Telecommunications Development Fund are to be considered citizens only of the District of Columbia. 7 U.S.C. § 941(c) (2006) (Rural Telephone Bank); 47 U.S.C. § 614(b) (2000) (Telecommunications Development Fund); 49 U.S.C. § 24301(b) (2000) (Amtrak). Most recently, Congress passed a statute providing that federal savings associations—another form of federally chartered corporation—are citizens of "the State in which such savings association has its home office." 12 U.S.C. § 1464(x) (2006). Again, Congress would not have had thought such legislation necessary if § 1332(c) already applied to federal corporations.

For the above reasons, the Court concludes that § 1332(c) does not apply to federally chartered corporations and therefore, for purposes of assessing whether diversity of citizenship exists between the parties, does not make Navy Federal a citizen of Virginia or any other state based on the location of its principal place of business.

**B. Navy Federal Is Not a Citizen of Virginia Under the "Localization" Test**

Navy Federal further argues that, if § 1332(c) does not apply, it is still a citizen of Virginia under the "localization" exception to the general rule that federally chartered corporations are not citizens of any state. [Doc. 151 at 25]. Forty years after the Supreme Court decided *Bankers' Trust*, and simultaneous with Congress's consideration and passage of the 1958 Amendment, a narrow exception to the *Bankers' Trust* rule known as the localization doctrine was created. The doctrine was first created by an Oregon district court in 1956. *See Elwert v. Pacific First Fed. Sav. & Loan Ass'n*, 138 F. Supp. 395 (D. Or. 1956). In 1959, the Third Circuit adopted the doctrine in *Feuchtwanger Corp. v. Lake Hiawatha Federal Credit*

*Union*, 272 F.2d 453. In *Feuchtwanger*, the court held that a federal credit union whose operations were, by the express terms of its charter, "localized" to the town of Lake Hiawatha, New Jersey was a citizen of New Jersey, and that the district court therefore had correctly held that it had diversity jurisdiction over the case, which involved the credit union and a New York corporation. *Id.* at 454–56. The credit union's charter specified that the credit union would "maintain its office at Lake Hiawatha, New Jersey" and would operate only in Lake Hiawatha, New Jersey. *Id.* at 454. The charter also limited the credit union's membership to "permanent residents of and those working in Lake Hiawatha, New Jersey; employees of th[e] credit union; members of their immediate families; and organizations of such persons." *Id.*

In assessing the credit union's citizenship, the Third Circuit recognized that prior precedent held that federal corporations are not citizens of any particular state for diversity purposes, but found that an exception was warranted, given that the credit union in the case was a "peculiarly local institution of a single community in the state of New Jersey." *Id.* at 454–55. The court explained its grounds for this exception as follows:

> Insofar as the citizenship concept is applicable at all to a corporation, its invocation to relate such a membership corporation as we have here to the place where its members live or work and its business is required to be transacted is logical. Moreover, local bias in favor of local persons and institutions in controversies with strangers, a principal justification for diversity jurisdiction, is more likely to be present in the case of a corporation thus localized in fact than one which is connected with the state only in the formal sense of having been incorporated there. If citizenship is to be attributed to any corporation for diversity purposes, it makes sense to apply it in this situation.

*Id.* at 455.

Neither Congress nor the Supreme Court has recognized the localization doctrine, but it has "won general acceptance in various federal courts" after its adoption by the Third Circuit in *Feuchtwanger*. *Arlington Cmty. Fed. Credit Union v. Berkley Reg'l Ins. Co.*, 57 F. Supp. 3d 589,

592–93 (E.D. Va. 2014). Indeed, the Eleventh Circuit has both recognized and expanded the localization doctrine. In *Loyola Federal Savings Bank v. Fickling*, the court held that limiting the localization doctrine to the facts in *Feuchtwanger* was "too restrictive" an application and therefore set forth a more inclusive test. The Eleventh Circuit's analysis went as follows:

> In *Feuchtwanger* the credit union in question restricted its operations to one particular community within the state of New Jersey. *Feuchtwanger* found localization and, thus, diversity. However, . . . the district court felt constrained in extending its analysis past those facts found in *Feuchtwanger*. We believe that this is too restrictive an application of the localization test. . . . Determining whether a federal corporation is localized for diversity purposes should not be simply a question as to whether that corporation's activities are exclusive to one state. Such an evaluation should involve a more expansive investigation into the corporation's business. A variety of factors are relevant to this inquiry, such as the corporation's principal place of business, the existence of branch offices outside the state, the amount of business transacted in different states, and any other data providing evidence that the corporation is local or national in nature. This more expansive approach comports with diversity jurisdiction's purpose of avoiding any possible bias favoring the party from the state in which the state court proceeding is brought.

58 F.3d 603, 606 (11th Cir. 1995) (citations omitted). Applying its newly formulated test to the case before it, the court held that the federal credit union in the case was sufficiently "localized" in Maryland, because (1) it had its principal place of business in Maryland; (2) it operated "[a]ll but one of its thirty-one branch offices" in Maryland; (3) "[o]ver two-thirds of its residential mortgages were located in Maryland"; (4) "[t]wo-thirds of the loans that it serviced were secured with property located in Maryland"; and (5) "[f]or loans it serviced secured by property outside Maryland, payments were made in Maryland." *Id.*

Neither Navy Federal nor the Defendants question the validity or applicability *vel non* of the localization doctrine and its subsequent development after *Feuchtwanger*. Nevertheless, the Court concludes that diversity jurisdiction cannot be established except on the terms set forth in § 1332(c). Federal district courts are courts of limited jurisdiction; and their subject matter jurisdiction is limited to that provided by Congress. *See* U.S Const. art. III, § 1.

Having found that this Court does not have diversity jurisdiction under § 1332(c), there is no other basis upon which to exercise diversity jurisdiction.[5]

Even assuming that *Feuchtwanger* was correctly decided (and that there is therefore a narrow "localization" exception to the general rule that federal corporations have no state citizenship), Navy Federal is not sufficiently localized in Virginia to be eligible for the exception. It has substantial operations and membership is a number of states outside of Virginia; its activities are not "confined to a single state," *Bankers' Tr.*, 241 U.S. at 309; and by its own admission, Navy Federal "has a presence in other states." [Doc. 151 at 26]. Accordingly, under the doctrines and rationales set forth in both *Bankers' Trust* and *Feuchtwanger*, Navy Federal is not a citizen of Virginia or any other state.

For the above reasons, the Court lacks subject matter jurisdiction over this action.

## IV. CONCLUSION

Accordingly, it is hereby

ORDERED that Defendant Debt Management Partners, LLC's Motion to Dismiss [Doc. 55] be, and the same hereby is, GRANTED; and this action is dismissed without prejudice for lack of subject matter jurisdiction; and it is further

---

[5] In any event, it appears to the Court that an extension of the localization doctrine beyond the narrow facts in *Feuchtwanger* contravenes the Supreme Court's holding in *Bankers' Trust* that a federally chartered corporation that was "incorporated under acts of Congress, not under state laws," and whose "activities and operations [are] not to be confined to a single state, but [are] to be carried on, as in fact they are, in different states," is not a citizen of any state. *Bankers' Tr.*, 241 U.S. at 309. No statute or subsequent Supreme Court decision has overturned or even questioned the validity of the *Bankers' Trust* holding. Indeed, the Supreme Court has since cited and applied other holdings from *Bankers' Trust* in later opinions. *See Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 560 (2017) (citing *Bankers' Trust* and applying its doctrine on the interpretation of jurisdictional provisions in the charters of federally chartered corporations); *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 257 (1992) (applying rules set forth in *Bankers' Trust* to conclude that the Red Cross Charter's "sue and be sued" provision conferred original federal question jurisdiction). *See Lund, supra*, at 343 (observing that the localization rule's foundations were "shaky" because the holding in *Bankers' Trust* "was clear and unequivocal and seemed to brook no exception to the rule that a federally chartered corporation lacks state citizenship absent express congressional direction to the contrary").

ORDERED that Defendant LTD Financial Services, L.P.'s Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint Counts One Through Five [Doc. 48], Defendant LTD Financial Services, L.P.'s Re-Filed Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint Counts One Through Five [Doc. 63], Defendant Advantage Assets II, Inc.'s and LTD Financial Services, L.P.'s Rule 12(b)(6) Motion to Dismiss or Strike Plaintiff's Claims for Trebled or Punitive Damages Under Breach of Contract Claims [Doc. 66], Defendant Bayview Solutions, LLC's Rule 12(b)(6) Motion to Dismiss Count Six of the Amended Complaint [Doc. 71], and Defendant Bayview Solutions, LLC's Rule 12(b)(6) Motion to Dismiss or Strike Plaintiff's Claim for Trebled or Punitive Damages Under Count Six of the Amended Complaint [Doc. 72] be, and the same hereby are, DENIED as moot.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
March 18, 2019